ROY BRUCE SMITH

V.

COMMONWEALTH OF VIRGINIA

Record No. 890885

March 2, 1990

Present: All the Justices

244

*Paul A. Maslakowski; Edward A. Mann (Byrne and Mann*, on brief), for appellant.

*Richard A. Conway, Assistant Attorney General (Mary Sue Terry, Attorney General; H. Elizabeth Shaffer, Assistant Attorney General*, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

In the first phase of a bifurcated proceeding conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Roy Bruce Smith of capital murder in the willful, deliberate, and premeditated killing of a law enforcement officer for the purpose of interfering with the performance of the officer's official duties. Code § 18.2-31(f). Then, in the second phase, the jury fixed Smith's sentence at death.

In a subsequent sentencing hearing, the trial court received the report of a probation officer and imposed the sentence of death. Code § 19.2-264.5. Smith is here for automatic review of his death sentence, which we have consolidated with the appeal of his conviction for capital murder. Code § 17-110.1(A) and (F).[1]

According to familiar principles, we will state the evidence in the light most favorable to the Commonwealth. The record reveals that Smith, a 41-year old computer technician, resided with his spouse in a townhouse development in the City of Manassas, Prince William County.

On July 24, 1988, a Sunday, Mrs. Smith announced that she was "going to her company picnic." She departed about noon without inviting Smith to accompany her, which caused him to feel "pretty letdown." He began drinking, consuming "eleven beers" between 2:30 p.m. and 6:30 p.m.

That evening, Smith decided to go to Noble's Restaurant in Manassas to "get something to eat." As he was leaving home, Mrs. Smith "was just driving in." They did not communicate with one another "at that time."

According to Pat Davis, manager of Noble's Restaurant, Smith, who frequented the place "one or two times a week," arrived at the restaurant "around 8:00 o'clock." He had three beers and a hamburger dinner. He became "obnoxious" when he "started talking about his . . . girlfriend." He stated that "[h]e wanted [the girl friend] to move . . . to Manassas, except his wife wouldn't allow it." He also said that "[i]f he couldn't have his . . . girlfriend, he wanted to commit suicide."

When customers began complaining about Smith's behavior, Davis "asked him to vacate" the premises even though he had not finished "the beer that he had in front" of him. As he was leaving, the manager observed what "look[ed] like a gun in the left side of his pocket."

Smith left Noble's "right at eight-thirty" and returned home. When he arrived, Mrs. Smith "was not there" and "some of her personal belongings" were missing. Smith "became very upset" and took a ".357 Magnum out of the gun case." He then took an "AR15" rifle out of its gun case and "put the bayonet on it." Finally, he took a ".44 Magnum out," attached it to a "web belt,"

---

[1] Smith was also convicted of using a firearm in the commission of a felony, but that conviction was not appealed.

and put clips "for the AR15" in the "web belt pouches." He also loaded the AR-15 rifle.

Linda and Emmett Cottrell were Smith's next-door neighbors. On the evening in question, Ms. Cottrell came out of her house and saw Smith sitting on his front porch. Referring to his wife, Smith asked: "Where's the bitch?" Ms. Cottrell replied that she did not know and left to visit a neighbor.

About 8:45 p.m., Emmett Cottrell observed Smith sitting on the front steps of his home. Smith was holding a rifle with a bayonet "on the end of it," pointing "straight in the air."[2] The defendant told Cottrell that "[t]he bitch ha[d] left [him]" and that he was "not going to make it through the night."

Previously, Smith had discussed his personal affairs with the Cottrells' seventeen-year-old daughter, Chrissy. Smith told Chrissy that he was in love with his girl friend and that, if he could not have the girl, "then he didn't want to live." On the evening in question, Chrissy saw Smith sitting on his front porch, holding "a big gun" between his legs. She heard him say that "he hoped . . . somebody would call the cops because one way or another someone was going to die tonight." Chrissy then left to visit a neighbor.

While Smith and Emmett Cottrell sat talking, Smith "fired one round into the air." A few minutes later, "kids across the street" set off some fireworks, and Smith fired two rounds "in that general direction." When Cottrell said he had "had enough," Smith stated: "I hope somebody calls the police because I'll shoot the first one that arrives and I hope they shoot me in return."

Daniel Wood, another of Smith's neighbors, remonstrated with Smith about firing the weapon. Wood told Smith: "You know, sir, [you] shouldn't really do that" and "[y]ou're going to get yourself in some serious trouble." Smith replied: "Well, hey, m_____ f_____, you ain't seen nothing yet. You wait till I start shooting people." Wood walked away, and Smith hollered: "Yes, that's all I'm waiting [for] is [for] somebody [to] call the police . . . then you [will] really start seeing some shooting. I'll probably shoot the first one I see."

---

[2] Other evidence showed that the weapon was a Colt AR-15 .223 semi-automatic rifle. It is referred to in the record as an "assault rifle."

Wood went into a neighbor's house and called the police. He urged the dispatcher "to tell them to be on extreme caution because the man seems to mean business."

Just before 9:00 p.m., a number of police officers arrived on the scene and parked where their vehicles would not arouse Smith's suspicions. Officer Anderson, in one of the units, observed Smith "sitting on his front porch." Anderson directed the dispatcher to "[h]ave a unit cruise around . . . to the rear of the townhouses." The dispatcher relayed the order to Sgt. John Conner, a uniformed officer, who indicated that "he was en route."

At this point, Smith "was still on [his] front steps," but when "some person . . . started across the street," Smith "immediately got up" and went inside. In a few moments, Sgt. Conner reported on his portable radio: "I've got him in sight he's coming out the back door." Other officers proceeded toward the rear of the house, and one of them, James K. Ryan, heard Sgt. Conner say: "Drop the rifle, drop the rifle now." Ryan then heard "gunfire going off," consisting of "eight to 12 . . . real sharp . . . cracks," followed by "a short pop and after that . . . there was a succession of real sharp cracks again."[3]

Ryan heard a man "groaning or . . . moaning" and, when he ran around the end of a fence separating Smith's back yard from his neighbor's, he saw Sgt. Conner lying on the ground in a "bare spot in the alleyway." Ryan observed "a lot of blood around [Conner's] head and two wounds in his back." Ryan left Conner in the care of another officer and went to help subdue Smith, who was struggling with several officers some twenty to twenty-five feet from Conner's location.

Officer Steven Bamford "started up the alleyway" after he heard the shots fired. When he arrived at the rear of Smith's house, he saw Smith "crouching down [or sitting] next to the deck" with "a long barreled weapon laid across his lap." A light above the door to Smith's house "shown back out onto the alleyway and that yard, [and] illuminated that area."

As Bamford "took a step," Smith saw him and tried to "put a magazine in the bottom of the weapon." Bamford attempted to "get back out of the way," but slipped and fell. When he regained his feet, Smith started to get up, and Bamford pointed his shotgun

---

[3] A firearms expert testified that "higher velocity, smaller caliber bullet[s]," such as those fired from an AR-15 rifle, "make . . . a cracking sound," while "larger caliber" bullets, such as those fired from a handgun, make "a booming sound."

at him and yelled, "[d]rop it" several times. Smith said, "I give up, I give up" and dropped his rifle, which was still equipped with a bayonet.

Bamford told Smith to get down on his knees. Smith complied, but when Bamford ordered him to "put his hands on the ground and walk out, to lay flat," Smith refused. A struggle ensued involving several officers, who were unable to "get the rifle from under [Smith]." When one of the officers said, "he's got another gun," Bamford kicked Smith in the face, but he continued to struggle. The struggle ended only after Smith had been placed in leg restraints and handcuffed behind his back.

During the struggle, Smith told the officers to "[g]o ahead and kill [him]." After he was subdued, Smith said that Conner was the "first priority, take care of him, take care of him. He's one of us, he's one of ours."

Mortally wounded, Sgt. Conner died several hours later. In the gun battle with Smith, Conner suffered wounds to his right leg, right forearm, back, and head. The wound to the head, which caused "a peach size section of skull [to be] missing," proved fatal. Gunpowder debris was found in the head wound, indicating the wound was caused by a gunshot fired within three feet if inflicted by a handgun or six feet if inflicted by a rifle.

Conner also suffered a wound to his left thigh, apparently self-inflicted. After the officers had handcuffed Smith, they heard a gunshot and saw "smoke coming out from around [Conner's] belly." Conner's nine-millimeter revolver was found in his right hand, underneath his body, pointing toward his left thigh.

In addition to the AR-15 rifle the police officers seized during the struggle, Smith had on his person a Ruger .44 magnum revolver with a ten-inch barrel and a Ruger .357 magnum revolver. The twenty-cartridge magazine for the AR-15 rifle contained three live cartridges, and another live cartridge was jammed in the firing chamber. The .44 magnum revolver was fully loaded with six live cartridges. The cylinder of the .357 magnum revolver contained three live cartridges and three spent casings. An ammunition belt taken from Smith's person contained seven clips of live ammunition for the AR-15 rifle.

The officers found behind Smith's house ten empty .223 caliber cartridge casings, which had been discharged by the AR-15 rifle. One casing was discovered midway along the fence line between Smith and his neighbor, and nine were discovered in the alleyway,

"directly outside [Smith's] backyard." In the area where Sgt. Conner was found, five spent nine-millimeter casings were found. As noted previously, Conner carried a nine-millimeter revolver.

Smith was transported to police headquarters, where it was discovered that he had suffered a gunshot wound to the foot. He was taken to a hospital, treated in the emergency room, and returned to headquarters. He gave the police a statement, which was recorded on tape. In the statement, Smith said that he did not start firing until after he was shot in the foot.

A blood test showed that Smith's blood alcohol content was 0.11 per cent by weight by volume. Smith's hands were tested for gunshot residue. Both tested positive for antimony, but only the left hand tested above the threshold for barium. Expert testimony showed that a revolver generally allows more of "these gases to escape and carry these particles on the hand" than a rifle.

Testifying in his own defense, Smith stated that he became "very upset" when he returned home after visiting Noble's Restaurant and found that his wife was not at home. He stated that he armed himself with his rifle and two revolvers, and he admitted firing two shots into the air from his front porch. He also admitted telling Daniel Wood, "wait 'til I start shooting people." He denied saying he would shoot a police officer.

Smith testified he went inside to put his weapons away because he assumed that someone would report the shooting incident and that the police would respond. When he went inside, he saw that the security light on the rear of his house was on, and he immediately went into his back yard and out into the alleyway to investigate.

Seeing no one, Smith walked back into his yard and heard someone say, "[h]alt, or I'll shoot." He saw a "flash" out of the corner of his eye and felt something hit his right foot. He shot the rifle in the direction of the flash, then turned in the opposite direction and fired three times. Thinking that the "clip was empty," he was trying to reload when he saw two police officers near his storage shed, and he dropped his rifle at the officers' command.

Smith denied that he ever saw Sgt. Conner or any other police officer prior to the time he started shooting in his back yard. He stated he did not know that Conner was a police officer or that an officer had been shot until he heard it on the police radio. He denied shooting Conner in the back of the head with his .357 magnum revolver. He said that he fired no weapon other than his

rifle and that he only fired that weapon with his right hand. He claimed he was incapable of firing a weapon with his left hand because of a pre-existing disability.

## PRETRIAL MATTERS

### Constitutional Issues

█ Smith contends that Virginia's capital murder scheme is unconstitutional on its face and as applied. All the arguments he makes, however, save one, have been consistently rejected by this Court in decisions ranging from *M. Smith* v. *Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967 (1979), to *Mu'Min* v. *Commonwealth*, 239 Va. 433, 389 S.E.2d 886 (1990). We reaffirm our earlier decisions and reject Smith's contention.

█ The one argument Smith makes which appears novel is that Virginia's capital murder statute is unconstitutional because "it does not provide the defendant a meaningful avenue of appeal, both as written, and as applied." Smith maintains that this Court's review of death sentences is "sporadic and arbitrary" because we fail to make an in-depth analysis in determining "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Code § 17-110.1(C)(1). Smith maintains further that this Court is "also sporadic and arbitrary" in its review to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1(C)(2). We reject this argument as meritless.

### Motion to Suppress

Smith filed a pretrial motion to suppress the statement he gave police following his arrest. Smith conceded that he had been given the warnings outlined in *Miranda* v. *Arizona*, 384 U.S. 436 (1966), but contended that he did not make a voluntary and knowing waiver of his rights.

In a pretrial hearing, the trial court heard the testimony of the police officers who struggled with Smith before arresting him, of the officer who took the statement from him, and of the rescue squad and emergency room personnel who treated him. The trial court also listened to a tape recording of Smith's statement. The

trial judge then stated that he had "no difficulty in finding that the statement was made voluntarily."

On appeal, Smith contends the trial court erred in denying his motion to suppress. The Attorney General argues, however, that because the statement was not admitted into evidence during the guilt phase of Smith's trial,[4] the question whether the statement was voluntary is moot.

■ We would agree with the Attorney General except for the fact that Smith also argues that a consent he gave for the search of his house was tainted because it was the "fruit of the poisonous tree." Smith argues this point in summary fashion. He says the tactics employed by the police in obtaining the statement were designed "to take advantage of [his] intoxicated, emotional, physically injured state."

We answer in similar summary fashion. We have read the testimony of the officers who struggled with Smith before arresting him, of the officer who took the statement from him, and of the rescue squad and emergency room personnel who treated him. We have also listened to the tape recording of the statement. And we think the trial court was correct in finding that the statement was made voluntarily and that the consent to search was valid.

## GUILT PHASE

### Jury Selection

■ Smith contends that the trial court erred in refusing to excuse for cause prospective jurors Kenneth Johnson and Kenneth Moore. Johnson, however, was chosen as an alternate juror. When the jury retired, his participation was not needed, and he was dismissed prior to the time the jury began its deliberations. Hence, Smith suffered no harm from the trial court's refusal to excuse Johnson for cause. *Gray v. Commonwealth*, 233 Va. 313, 339, 356 S.E.2d 157, 171, *cert. denied*, 484 U.S. 873 (1987).

With respect to prospective juror Moore, Smith objected to his selection on the sole ground that "he had a predisposition to believe testimony by police officers, to give that more weight than lay witnesses." On appeal, Smith raises other objections to Moore's selection, but we will consider only the ground advanced in the trial court. Rule 5:25.

---

[4] The statement was admitted into evidence at the sentencing phase of the trial.

When asked whether he felt "that the testimony of a police officer carries more weight . . . than that of an ordinary citizen," Moore said: "That is a tough call." Continuing, he stated:

Police officers have always been in a high esteem and you always think that they are the ones that are being able to tell the truth more than an average citizen. But then, again, it is a preconceived notion that I have probably had for the majority of my life.

Moore then replied in the negative when asked whether "that preconceived notion [would] interfere with [his] ability to weigh the evidence and render a fair and impartial decision . . . or would [he] automatically give more weight to the testimony of a police officer."

■ A closely similar situation was presented in *Waye v. Commonwealth*, 219 Va. 683, 251 S.E.2d 202, *cert. denied*, 442 U.S. 924 (1979). By substituting the name of Moore for the prospective juror in *Waye*, that case decides the point involved in this one:

Whether [Moore] should have been excluded for cause was a matter within the sound discretion of the trial court. . . . [Moore's] ultimate attitude on the subject of the testimony of police officers was essentially neutral. His responses to the various questions propounded to him, while perhaps not displaying the grasp of a legal technician, satisfactorily indicated that he not only stood indifferent in the cause but also possessed sufficient intelligence to be able to afford the defendant a fair and impartial trial. Under these circumstances, we cannot say that the trial court abused its discretion in refusing to exclude [Moore] for cause.

*Id.* at 690, 251 S.E.2d at 206-07 (citation omitted).

## Motion in Limine

■ On the morning of trial, Smith moved to exclude the testimony of a security guard and two police officers the Commonwealth intended to call for the purpose of showing that Smith had threatened them several months before the shooting in question. The trial court held that the testimony was admissible but in-

structed the jury on the limited purposes for which the testimony could be considered.

Frederick Lepine, a security guard at a hotel in Waltham, Massachusetts, testified that on February 5, 1988, some five and one-half months before the shooting in question, he observed Smith with an open whiskey bottle in the hotel lobby and told him drinking was not permitted in the lobby. Smith became angry, told Lepine that he would be sorry, that "all people like [him] will be sorry," and swung the whiskey bottle at him.

Police were called, and Officer David H. Allen was one of those responding. He testified that he and a fellow officer got into a struggle with Smith and that after Smith was subdued and placed in a police cruiser, he said: "You guys are f____ing a__holes, I have a 44 magnum and I'm going to blow you guys away."

Craig Sala, a police officer in Santa Clara, California, testified that on March 24, 1988, four months before the shooting in question, he arrested Smith in a restaurant and transported him to the police station. There, Sala advised Smith that he "was going to go to county jail and he wasn't going to be able to catch his plane flight back to Manassas." Smith became angry and told Sala that "if circumstances were different he'd blow [Sala] away with his gun."

■ Smith first argues that the foregoing testimony was inadmissible because irrelevant. Generally, evidence of prior offenses is inadmissible because it "confuses the issue before the jury, unfairly surprises the accused with a charge he is not prepared to meet, and tends to prejudice him in the minds of the jury." *Fleenor* v. *Commonwealth*, 200 Va. 270, 275, 105 S.E.2d 160, 163 (1958).

However, we have recognized specific exceptions to the rule. We have upheld the admission of evidence of prior offenses when offered to prove (1) premeditation, *M. Smith, supra,* 219 Va. at 471, 248 S.E.2d at 145, (2) absence of mistake or accident, *Moore* v. *Commonwealth*, 222 Va. 72, 76, 278 S.E.2d 822, 824 (1981), (3) motive or intent, *Stockton* v. *Commonwealth*, 227 Va. 124, 142, 314 S.E.2d 371, 383, *cert. denied,* 469 U.S. 873 (1984), and (4) the conduct and feelings of the accused toward his victim, *Hawks* v. *Commonwealth*, 228 Va. 244, 247, 321 S.E.2d 650, 652 (1984).

■ The trial court held that the testimony of Lepine, Allen, and Sala was admissible under any one of the foregoing exceptions.

We agree with the trial court. The trial court also held that the lapse of time between the prior occurrences and the date of the present offense was not so great as to render the testimony inadmissible. We also agree with the trial court on that point.

■ Smith argues further that the testimony was inadmissible because it was the Commonwealth's theory Smith disliked all police officers and, at the point Lepine, Allen, and Sala testified, the Commonwealth had adduced no evidence showing Smith knew Conner was a police officer at the time of the shooting. However, as we shall demonstrate *infra*, there was abundant evidence produced later in the trial showing that Smith did know Conner was a police officer when the fatal shooting occurred. Hence, there was an evidentiary link established between the statements made by Smith in February and March of 1988 and the occurrences of July 24, 1988.

■ It is immaterial that the disputed testimony was admitted before the evidentiary link was established. The order of presentation of evidence "is usually a matter left to the discretion of the trial court." *Floyd* v. *Commonwealth*, 219 Va. 575, 582, 249 S.E.2d 171, 175 (1978). We find no abuse of discretion here.

Finally, Smith argues that the Commonwealth is mistaken in its assertion that the testimony was admissible as evidence of threats against a class, *viz.*, police officers. We need not settle this dispute, however, since we have held the testimony admissible on other grounds.

### Admission of Expert Testimony

Frances Patricia Fields, the assistant medical examiner who conducted an autopsy on Sgt. Conner's body, stated during her testimony that she found powder debris at the lower part of the wound in the back of Conner's head and that this was consistent with a "close gunshot wound." The prosecutor then asked the doctor "how far away . . . the weapon [would] have to be." Defense counsel objected on the ground Dr. Fields had not been qualified as an expert in ballistics.

There followed questions which elicited the information that Dr. Fields had received training in, and had read literature on, the subject of "the distance of weapons . . . and the cause and effect of wounds." The doctor also answered affirmatively to the question whether she customarily testified "to such things."

The prosecutor then said, "I think she can testify to that your Honor." Without further objection from Smith's counsel, the doctor was permitted to state that powder debris "may reach a body . . . out two to three feet" with a handgun or "out to approximately six feet" with a rifle.

We think that in the absence of further objection from the defense, the qualification of Dr. Fields to testify as an expert in ballistics was sufficiently established. Hence, the trial court did not err in permitting the witness to state her opinion.

Smith makes another contention concerning the testimony of Dr. Fields. Evidence previously introduced showed that the barrel of Smith's .357 magnum revolver contained "tiny spatters" of human blood, rather than "a drip," which means that the blood was "deposited with some force behind it."

During her testimony, Dr. Fields was asked whether the presence of "spatters of blood" on the barrel of a gun was consistent with "blow back blood," meaning that material a "bullet hits can be propelled by gases, back towards the gun itself." In answering the question, the doctor used in the presence of the jury a drawing which had been prepared by a previous witness but which had not been introduced into evidence. Dr. Fields stated that the presence of blood on a gun barrel is consistent with "blow back blood" and went on to say that "[b]lood spatters can generally be blown back four to six inches from the skin surface."

Smith argues that because the drawing had not been admitted into evidence, Dr. Fields should not have been permitted to use it in giving her expert opinion. However, all the facts necessary to the formation of the doctor's opinion were already in evidence. Hence, it was not error to permit use of the drawing.

## Refusal of Expert Testimony

Prior to trial, Smith filed a Notice of Diminished Capacity Defense, stating that he proposed "to introduce psychiatric evidence at trial that he lacked the capacity to form the necessary premeditation to commit the offense of capital murder as charged in the indictment." The Commonwealth filed a motion in limine seeking to "prohibit [Smith's] diminished capacity defense and the use of any psychiatric evidence in support thereof."

The trial court heard the motion on a stipulation of what Smith's psychiatrist, Dr. Joseph J. David, would say if called as a witness. The court granted the Commonwealth's motion, but per-

mitted Smith to proffer the evidence at trial. Again at trial, the court ruled the evidence inadmissible.

The stipulation and proffer show that Dr. David examined Smith and diagnosed him as suffering from "alcohol dependence and from a borderline personality disorder." The doctor stated that Smith, whose I.Q. is 124, had the ability to form intentions and to premeditate, but that he did not have the capacity to follow through on his intentions.

Smith contends that the trial court erred in ruling the evidence inadmissible. He argues that the evidence should have been admitted on the issue of premeditation.

We disagree. In *Rhodes* v. *Commonwealth*, 238 Va. 480, 384 S.E.2d 95 (1989), we said that " '[t]o premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder.' " *Id.* at 485, 384 S.E.2d at 98 (quoting *Smith* v. *Commonwealth*, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980)). While neither *Rhodes* nor *Smith* was a capital murder case, the adoption of a specific intent also distinguishes capital murder from second degree murder.

In *Stamper* v. *Commonwealth*, 228 Va. 707, 324 S.E.2d 682 (1985), we held that "[u]nless an accused contends that he was beyond [the borderline of insanity] when he acted, his mental state is immaterial to the issue of specific intent." *Id.* at 717, 324 S.E.2d at 688. In the course of the opinion, we said:

The use of expert evidence has been approved in some jurisdictions to show 'diminished capacity,' . . . and in others to show, by circumstantial evidence, that the requisite specific intent did not in fact exist. . . . The first theory represents 'a fundamental change in the common law theory of [criminal] responsibility,' . . . and we decline to adopt it. The second approach has been characterized in our holdings as an invasion, by expert opinion on the ultimate fact in issue, of the province of the factfinder.

*Id.* at 716, 324 S.E.2d at 688 (citations omitted).

Smith argues that *Stamper* is inapposite because it involved a charge of possession with intent to distribute marijuana, rather than capital murder. Under Virginia law, Smith says, it is clear that "there exists a defense available only to capital or first degree murder cases and not to any other offense." That defense, Smith

points out, is voluntary intoxication, evidence of which is offered to negate specific intent or premeditation. This, Smith maintains, is the same purpose for which he offered Dr. David's testimony. Then, quoting *State* v. *Noel*, 102 N.J.L. 659, 133 A. 274 (1926), Smith asserts it would be "barbarous and insensible . . . to extend a more lenient legal rule to the case of a drunkard . . . than to the case of a poor demented creature." *Id.* at 694, 133 A. at 285 (Kalisch, J., concurring).

*Stamper* provides the reason for excluding the type of evidence Smith champions. There, we said:

> The state of knowledge in the fields of medicine and psychiatry is subject to constant advance and change. The classifications and gradations applied to mental illnesses, disorders, and defects are frequently revised. The courts cannot, and should not, become dependent upon these subtle and shifting gradations for the resolution of each specific case.

228 Va. at 716, 324 S.E.2d at 688.

Smith argues that even if Dr. David's testimony was inadmissible under *Stamper*, it was admissible as rebuttal of the Commonwealth's evidence of Smith's prior bad acts, which was admitted, Smith points out, to show motive, intent, and premeditation. Dr. David's testimony, however, would not have served Smith's purpose. The doctor did not testify that Smith was incapable of forming an intent or of premeditating. Rather, the doctor testified to the contrary. Smith's impairment, according to Dr. David, consisted of an inability to follow through on his intentions. Evidence of this inability would have been irrelevant to the question whether Smith could form an intent or premeditate in the first place.

### Refusal to Admit Taped Statement

Smith contends that the trial court erred in refusing to admit into evidence the tape recording of the statement he gave police on the night of the murder. In the trial court, Smith argued that the tape recording was admissible under the "prior consistent statement" exception to the hearsay rule. Smith obviously offered the taped statement to show that his testimony at trial was consistent with his earlier statement, recorded on tape, that he did not start firing until after he was shot in the foot.

Smith now argues that the statement was admissible under the "state of mind" exception to the hearsay rule. But the same reason that makes the "prior consistent statement" exception inapplicable also makes the "state of mind" exception inapplicable. At the time he gave the taped statement, Smith had a reason to fabricate. By then, even according to his own account, he knew he had shot a police officer, and, according to the account accepted by the jury, he knew he had threatened to "shoot the first [police officer] that arrive[d]." Hence, he had a clear motive to lie about who fired the first shot, and he had sufficient time to fabricate a story. Under these circumstances, his prior statement was inadmissible. *See Scott* v. *Moon*, 143 Va. 425, 433, 130 S.E. 241, 243 (1925), and *Honaker Lumber Co.* v. *Kiser*, 134 Va. 50, 60, 113 S.E. 718, 721 (1922).

## Sufficiency of Evidence

Smith contends that the evidence is insufficient to support his conviction. Quoting *Delong* v. *Commonwealth*, 234 Va. 357, 369, 362 S.E.2d 669, 676 (1987), *cert. denied*, 485 U.S. 929 (1988), Smith argues that the burden was upon the Commonwealth to prove that he "acted with the purpose of interfering with what he perceived to be an officer's performance of a law enforcement duty." *A fortiori*, Smith maintains, the Commonwealth had the burden of proving he knew Sgt. Conner was a police officer. The proof on that point, Smith says, "falls far short."

We disagree with Smith. He takes a slanted view of the record. He picks out isolated portions of the evidence and then concludes it was too dark in the area where the shooting occurred for him to have seen Sgt. Conner or his uniform.

For example, Smith quotes a portion of the testimony of Daniel Wood where the witness said "it was dark . . . then." Later in his testimony, however, Wood stated that he stood on an overturned bucket to peer over a fence and that there were "a couple" lights burning "out back," including one on Smith's house. Importantly, Wood said that, from "[a] little more than a hundred feet" away, he could see "officers around Mr. Smith" and "four or five . . . around where the officer was laying."

Another instance of the liberty Smith takes with the facts involves the testimony of Officer Bamford. Smith quotes a portion of Bamford's testimony where he stated that "in the alleyway there was no light at all." It is obvious, however, that this statement did

not pertain to the portion of the alleyway behind Smith's house. After making the statement, Bamford testified that he "started up the alleyway" and when he reached a point behind Smith's house, a light between the first and second floor windows of that house "shown back out onto the alleyway and that yard [and] illuminated that area."

Smith also states that Officer Ryan testifed "he was not certain that it was a law enforcement officer behind [Smith's] house until he heard the voice of Sgt. Conner over the radio." But Officer Ryan's statement referred to a point in time when he was "crouched down behind [a] station wagon" that was "backed up into the driveway" *at the front* of one of the houses in the area. Besides, Ryan's statement obviously did not refer to lighting conditions. Indeed, Ryan said that he "didn't need headlights to get [to the area] and it was just starting to get dark."

When he did reach the rear of Smith's house, Ryan was able to see a figure on the ground, which turned out to be the figure of Sgt. Conner, from "one and a half townhouse back yards" away, or approximately 30 feet. And, according to Ryan, there was "a light on" which made the area "[w]ell lit."

In addition to this evidence supporting the Commonwealth's position that Smith knew his firing was directed at a police officer, there are numerous other incidents of proof throughout the record in support of that position. Not the least is the testimony of Smith's neighbors about his hope that the police would be called and his threat that he would shoot the first police officer to arrive. Further evidence of Smith's guilty knowledge came from his own testimony that he had assumed someone would report the front-porch shooting incident to the police and that the police would respond.

Then, there is Smith's statement, made after he was subdued, that Sgt. Conner was "one of us . . . one of ours." We think this statement was a devious attempt by Smith to align himself with the police. But, whatever Smith's purpose in making the statement, it served as evidence of his guilty knowledge. There was other evidence showing that the statement was made before anyone had "verbally identified the man who had been shot as a police officer." Smith has not claimed that the way he learned a policeman had been shot was by observing the victim's uniform *after* the shooting; indeed, despite overwhelming evidence to the contrary, Smith insisted in his testimony that the area where Con-

ner fell was dark. Hence, the jury was entitled to find that the only way Smith could have known Conner was a police officer was by observing his uniform *before* he shot him.

Our final observation on the sufficiency of the evidence concerns Smith's testimony that he did not start firing until after he was shot in the foot. Given the fact that only Smith fired a rifle and given the further fact that the first shots fired were "real sharp . . . cracks" indicative of rifle fire, we think the jury was entitled to disbelieve Smith's testimony and find it was he who fired the first shot.

### Instructions

Smith contends that the trial court erred in granting Instruction No. 4, offered by the Commonwealth, and in refusing his Instruction H. Smith says Instruction No. 4 erroneously equates premeditation with "specific intent to kill," while Instruction H properly equates premeditation with "design to kill."

As noted previously, however, we held in *Smith, supra,* 220 Va. at 700, 261 S.E.2d at 553, that "[t]o premeditate means to adopt a specific intent to kill." Hence, Instruction No. 4 properly stated the law applicable to this case, and Instruction H did not.

Smith next contends that the trial court erred in granting Instruction No. 6 on circumstantial evidence, offered by the Commonwealth, instead of his Instruction C. The only difference we can discern between the two instructions is that Instruction C mentions "presumption of innocence," while Instruction No. 6 does not. The jury was fully instructed on the presumption, however, and it was not necessary to reiterate the point in an instruction on circumstantial evidence.

Smith also contends that the trial court erred in granting Instruction No. 7, offered by the Commonwealth, which told the jury that it might infer malice "from the deliberate use of a deadly weapon unless, from all the evidence, [the jury has] a reasonable doubt as to whether malice existed." This instruction, Smith argues, is violative of the rule enunciated in *Sandstrom* v. *Montana,* 442 U.S. 510 (1979), that an instruction which constitutes "either a burden-shifting presumption . . . or a conclusive presumption" is unconstitutional. *Id.* at 524.

Although decided before *Sandstrom, Warlitner* v. *Commonwealth,* 217 Va. 348, 228 S.E.2d 698 (1976), *cert. denied,*

430 U.S. 957 (1977), is dispositive here. We held in *Warlitner* that an instruction which told the jury "malice may be implied from the deliberate use of a deadly weapon," *id.* at 349, 228 S.E.2d at 699-700, did not constitute a conclusive presumption or "impose upon the accused any burden of persuasion." *Id.* at 350-51, 228 S.E.2d at 700.

■ Finally, Smith contends the trial court erred in amending one of his instructions and in refusing to grant two other instructions he offered. We find no error in the actions of the trial court with respect to these instructions.

## SENTENCING PHASE

### Admission of Evidence

Prior to trial, Smith filed a motion asking the trial court to require the Commonwealth to furnish a bill of particulars with respect to the evidence it intended to introduce at sentencing. The court ordered the Commonwealth to furnish certain information by March 7, 1989, and the Commonwealth complied.

On March 27, 1989, shortly before the sentencing hearing began, the Commonwealth filed a supplemental bill of particulars. In the supplemental bill, the Commonwealth stated it intended to introduce evidence through a witness, Travis Peters, that prior to the shooting in question, Smith told Peters "he was thinking of killing his wife and moving his . . . girlfriend into his residence."

The supplemental bill also stated that the Commonwealth intended to call Officer Plum of the Manassas Police Department. According to the supplemental bill, Plum would "testify to Sgt. Conner's words, actions and condition after the shooting."

Smith moved that the trial court rule the evidence inadmissible because not timely furnished. During argument on the motion, the Commonwealth's Attorney told the court that although the witness Peters had been summoned for an earlier trial date, the Commonwealth had not learned of the evidence of Smith's threat against his wife until the middle of the guilt phase of Smith's trial. With respect to the evidence the prosecution wanted to introduce through Officer Plum, the Commonwealth's Attorney told the court he had attempted to introduce the same evidence at the guilt phase of the trial but it was excluded.

The court denied Smith's motion, and the disputed evidence later was admitted. Smith contends the trial court erred in admitting the evidence. ·

We disagree with Smith. We will assume, without deciding, that the Commonwealth was required under Rule 3A:11 and the trial court's order to furnish the information in question. When such information is required but the Attorney for the Commonwealth has failed to comply, Code § 19.2-265.4(B) vests the trial court with wide discretion. It may order the Commonwealth to permit discovery or inspection, grant a continuance, prohibit the Commonwealth from introducing evidence not disclosed, or "enter such other order as it deems just under the circumstances."

Here, where there was no failure to comply but only an allegedly late compliance, the trial court certainly was not bound to prohibit introduction of the disputed evidence. It was within the trial court's discretion to admit the evidence if it deemed such action "just under the circumstances." We find no abuse of discretion in the court's action.

Smith also contends that the trial court erred in permitting a witness, Douglas Guernsey, to testify that he had suffered certain injuries at Smith's hands in 1971. Guernsey testified that he was involved in a minor traffic accident caused by Smith, after which Smith, without provocation, stabbed him several times with a bayonet. Guernsey stated that as a result of the stabbing, he suffered a severed rib and a punctured lung, leaving him with the use of only "one and a half lung."

Smith argues that the trial court should have required Guernsey to qualify as an expert before permitting him to testify concerning "the nature and extent of his injuries." The admission of this evidence, Smith says, "constituted prejudicial error."

We disagree. We think that once the Commonwealth proved Smith's brutal and unprovoked attack upon Guernsey, the admission of his testimony concerning the nature and extent of his injuries was harmless error, if error at all.

## Instructions

Smith contends the trial court erred in granting Instruction No. 2 at the sentencing phase. This instruction told the jury:

In deciding whether the defendant committed an 'aggravated battery' when he shot John Conner, you may consider

the number of gun shot wounds inflicted upon the victim provided you find that death did not result instantaneously from the first shot.

Smith argues that the instruction "was an incorrect statement of the law and was argumentative rather than instructive." We disagree.

The trial court also granted Instruction B. This instruction stated that " '[a]ggravated battery' means a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish the act of murder."

Instruction B is taken from the language of *M. Smith, supra*, 219 Va. at 478, 248 S.E.2d at 149. Instruction No. 2 is taken from the language of *Barnes* v. *Commonwealth*, 234 Va. 130, 139-40, 360 S.E.2d 196, 203 (1987), *cert. denied*, 484 U.S. 1036 (1988). Both instructions contain correct statements of the law and complement each other in the factual situation presented here. Hence, it was not error for the trial court to grant Instruction No. 2.

Smith also contends the trial court erred in refusing to grant Instruction D at the sentencing phase. This instruction would have told the jury:

In order for you to find that there is a 'probability' that Roy Smith would commit criminal acts of violence that would constitute a continuing serious threat to society you must find that there is a likelihood substantially greater than a mere possibility that he would commit such acts in the future.

During a discussion of the instruction, Smith's counsel conceded that it "simply define[d] probability." The trial judge stated that he did not "think the Jury need[ed] to be instructed on the difference between possibility and probability." We agree with the trial judge.

## Denial of Mistrial

During closing argument in the sentencing phase, the Commonwealth's Attorney told the jury: "[I]f you don't believe that this man is dangerous and you don't believe he will constitute a continuing threat to society, you ought to acquit him." Defense counsel

objected to the statement, asked the court to instruct the jury to disregard the remark, and moved for a mistrial.

The trial judge said to the prosecutor: "I assume you misspoke?" The prosecutor replied: "I apologize. You ought to sentence him to life, rather than death, if you believe that—" Defense counsel interrupted to say: "Will the Court rule on the motion for a mis-trial?" The trial judge replied: "I'll deny your motion."

Smith argues that because he had already been convicted, the argument of the Commonwealth's Attorney "effectively equated a sentence of life imprisonment with an acquittal" and the trial court "refused to grant a mistrial" or to "ask the jury to disregard [the] statement." This refusal, Smith concludes, represents prejudicial error.

Under Code § 8.01-361, "in any case, the court may discharge the jury when it appears that . . . there is a manifest necessity for such discharge." In determining whether manifest necessity exists, a trial court is vested with broad discretion. *Turnbull* v. *Commonwealth*, 216 Va. 328, 335, 218 S.E.2d 541, 546 (1975).

Here, we think the trial judge's inquiry about whether the Commonwealth's Attorney had mispoken, followed by the latter's immediate apology and correction, were sufficient to dissipate any prejudice that may have resulted from the prosecutor's obvious slip-of-the-tongue. Hence, the trial court did not abuse its discretion in denying the motion for mistrial or in failing to instruct the jury to disregard the prosecutor's statement.

### Post-Sentence Report

Pursuant to Code § 19.2-264.5, the trial court ordered the preparation of a post-sentence report before deciding whether to impose the death sentence fixed by the jury. The report was prepared by a probation officer and filed with the court.

Smith contends the trial court should have commuted the death sentence to life imprisonment because the report contained a victim impact statement prepared by Sgt. Conner's widow. Smith maintains that inclusion of the impact statement was improper under *Booth* v. *Maryland*, 482 U.S. 496 (1987), rendering the trial court's imposition of the death sentence erroneous.

In *Booth*, a victim impact statement was read to the jury before it retired to determine whether the sentence for capital murder

should be death. The statement not only described the impact of the murder upon the victim's family but also expressed the opinions of family members on an appropriate sentence. The jury fixed the sentence at death. The Supreme Court reversed, holding that use of the impact statement violated the Eighth Amendment because the jury's consideration of the statement created "an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Id.* at 505.

 Here, however, the impact statement was not read to the jury nor was the jury ever made aware of its existence. It was considered, if at all, only by the trial judge and then only after the jury had fixed Smith's sentence.

Smith argues that this distinction is irrelevant. He says that Code § 19.2-264.5 places upon the trial court the responsibility of making the final determination of the appropriate sentence and that the court functions much like a jury and is subject to the same improper influence of a victim impact statement.

We disagree with Smith. We think the distinction between this case and *Booth* is both relevant and dispositive. "A judge, unlike a juror, is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments . . . during the mental process of adjudication. . . ." *Richard Eckhart* v. *Commonwealth*, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981). Hence, the "impermissible risk" present in *Booth* does not exist here.

Smith also contends that the trial court improperly "admitted" the post-sentence report because "it had been done in violation of the statute." Smith's complaint is that the probation officer "did not make efforts to contact certain people" and made "subjective decisions about what information he was going to provide in the report." The result, Smith says, is that the report did not fully disclose "information in mitigation or which might have been beneficial to [Smith] in his attempt to have the court set aside the death sentence."

 We reject Smith's contention. In *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980), we said:

> Code § 19.2-264.5 provides only that a thorough investigation be conducted; it does not specify that any particular procedure be used in compiling the report or that any partic-

ular information be included therein. Decisions concerning such matters must by necessity be left largely to the discretion of the trial court and the individual probation officer.

220 Va. at 279, 279 S.E.2d at 821.

## PROPRIETY OF THE DEATH SENTENCE

Code § 17-110.1(C) requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

### Passion and Prejudice

The sum total of Smith's argument on this subject is as follows:

The Commonwealth did not rely upon the evidence in seeking the conviction and sentence of death but rather relied upon passion and prejudice in gaining [its] goal.

The verdict and sentence of death were not supported by the evidence but were a product of passion.

Notwithstanding the brevity of Smith's argument, this Court must determine for itself whether the sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factor. Having searched the record with this duty in mind, we have found nothing which suggests that the death sentence was the product of any arbitrary factor.

In fixing Smith's punishment at death, the jury found there was a probability Smith "would commit criminal acts of violence that would constitute a continuing serious threat to society." The jury also found that Smith's "conduct in committing the offense [was] outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder."

Hence, the jury found both aggravating factors, "future dangerousness" and "vileness," which, singly or in combination, may support a sentence of death. Code § 19.2-264.2. We think that the record amply supports both findings.

With respect to "future dangerousness," the evidence shows a chain of events beginning with Smith's unprovoked stabbing of a motorist in 1971, followed by his threat, made at the point of a gun, to kill a police officer in the same year. In 1973, he threatened to kill another police officer. In 1978, while completely nude, he broke into the home of a sleeping couple and attacked them with a hammer. In 1985, he was convicted of indecent exposure. He was arrested for similar conduct in 1988, but he failed to appear for trial, and a bench warrant was issued for him. He threatened two more police officers in 1988 and swung a whiskey bottle at a security guard.

The trial judge aptly characterized this case history when he said it was "a chilling and telling prediction of what was to come." And what was to come, of course, was the tragedy which removed all doubt, if any existed before, of Smith's "future dangerousness."

With respect to "vileness," Smith's depravity of mind is exemplified by his actions on the night in question, which may be described as the carrying out of a diabolical plot to lure "the police there to his house," as the trial judge put it, "obviously with the intent to take deadly action against them." And the jury's finding of aggravated battery is supported by the evidence of the multiple wounds Smith inflicted upon Sgt. Conner. The trial judge correctly described Conner's wounds as "more than necessary to accomplish the death of the victim." Furthermore, the wounds did not result in instantaneous death but caused the victim severe pain until he was drugged into insensibility at the hospital.

The finding of aggravated battery is supported further by the viciousness with which the fatal wound to the head was inflicted. The trial judge observed that, after Sgt. Conner "was already hit and down," Smith "walked up to the officer" and "shot him [in the back of the head] at point blank range." This observation was fully justified.

## Proportionality

Smith's entire argument on this point reads as follows:

The sentence [of death] was not proportional to similar cases and should be commuted to a life sentence.

■ The test of proportionality is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper*, 220 Va. at 284, 257 S.E.2d at 824. In *Delong*, 234 Va. at 372, 362 S.E.2d at 677, we compiled the capital cases involving the murder of police officers. And in *Spencer* v. *Commonwealth*, 238 Va. 295, 319-20, 384 S.E.2d 785, 799-800 (1989), we compiled those cases where, as here, the death sentences were based upon both aggravating factors of "future dangerousness" and "vileness."

Having reviewed our earlier decisions and having considered both the crime and the defendant involved here, we have no hesitancy in saying that juries in this jurisdiction will generally approve the supreme penalty for comparable or similar crimes. Accordingly, and because we have found no error in the proceeding in which Smith was convicted of capital murder and sentenced to death, we will affirm the judgment of the trial court.[5]

*Affirmed.*

---

[5] On June 9, 1989, Smith filed a pro se motion alleging the ineffectiveness of his trial counsel. On July 27, 1989, we appointed John B. Boatwright, III, to represent Smith with respect to his claim of ineffectiveness of counsel and directed Mr. Boatwright to pursue the claim if, pursuant to Code § 19.2-317.1, " 'all matters relating to such issue [of ineffectiveness] are fully contained within the record of the trial,' " and, if not, to so report to this Court. On September 27, 1989, Mr. Boatwright reported to this Court that "all matters relating to allegations of ineffective assistance of counsel are not fully contained within the record of this trial." Accordingly, we have not considered Smith's claim of ineffective assistance. *See Mu'Min*, 239 Va. at 452, 389 S.E.2d at 898.