COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Beales, O'Brien and Fulton
Argued by videoconference


RANDOLPH EUGENE SMITH

                                    MEMORANDUM OPINION[*] BY

v.      Record No. 0523-21-2           JUDGE JUNIUS P. FULTON, III
                                        MARCH 1, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Richard Strouse Wallerstein, Jr., Judge

John G. LaFratta for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Mark R.
Herring,[1] Attorney General, on brief), for appellee.


Randolph Eugene Smith appeals his convictions, following a jury trial, of first-degree

murder and use of a firearm in the commission of a felony for the murder of his stepson, Neal

Matthew Waters. Appellant challenges the sufficiency of the evidence to convict him, arguing that

he acted in self-defense, in the heat of passion, or without premeditation. For the reasons stated

herein, we affirm.

## I. BACKGROUND

Because appellant challenges the sufficiency of the evidence, "we review the evidence in the

'light most favorable' to the Commonwealth, the prevailing party in the trial court."

*Commonwealth v. Cady*, 300 Va. 325, ___ (2021) (quoting *Commonwealth v. Hudson*, 265 Va. 505,

514 (2003)). In doing so, we discard any conflicting evidence and regard as true all credible

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018).

On October 9, 2019, appellant resided with Michelle Waters-Smith, his wife, Neal Matthew Waters, the victim who was Waters-Smith's forty-year-old son, and E.W., Waters' seven-year-old son. That morning, while Waters-Smith was helping E.W. get ready for school, an argument ensued which ultimately resulted in appellant shooting Waters four times with a pump action, twelve-gauge shotgun, causing Waters' death.

When police arrived at the home, Waters' body was located in the dining room at the doorway to the kitchen on the middle floor of the tri-level house. A chef's knife was found in Waters' outstretched right hand. Although the knife was swabbed for fingerprints, a laboratory analysis failed to identify any fingerprints of value, meaning police could not determine who may have touched or not touched it. Police found three shotgun shells and wadding on the kitchen floor near the steps leading up into the kitchen. Another shotgun casing was "just inside the living room at the doorway that goes into the kitchen." In the master bedroom on the third floor of the house, a dresser and bed frame were tilted on their side. In another third-floor bedroom, a chair was tilted on its side and the shotgun used to kill Waters was found in the closet.

Appellant made a statement to police, a recording of which was played at trial. Throughout his interview, appellant described Waters as violent and physically and verbally abusive toward both himself and Waters-Smith. On the morning in question, appellant stated that Waters-Smith was helping E.W. get ready for school when Waters went on a "rampage," cursing and shouting at Waters-Smith and shoving her down the steps. Shortly before 7:30, Waters-Smith left to take E.W. to school. When she returned, Waters continued his rampage, prompting appellant and his wife to retreat upstairs to the bedroom and shut the door in an attempt to avoid confrontation or separate themselves from Waters but Waters followed them and pushed through the door, knocking

Waters-Smith back. Once inside the bedroom, Waters began knocking over furniture, turning over the dresser and turning the bed frame up on end. At that point, Waters-Smith left the residence and drove away, leaving appellant and Waters behind. According to appellant, after Waters-Smith left he remained upstairs in the bedroom while Waters continued "spouting off" downstairs.

Appellant stated that he went downstairs to get a bottle of water and encountered Waters waving around a kitchen knife, and saying he was going to "put [him] in the ground," "cut [him] from ear to ear," and "cut [his] throat." Taking Waters "at [his] word," appellant told detectives that he felt his life was threatened, so he went upstairs and retrieved his loaded shotgun from the closet. Waters continued yelling and screaming as appellant returned with his shotgun. Appellant stated that when he returned downstairs, Waters came at him with the knife, threatening to kill him. Although he told Waters to calm down and put down the knife, Waters kept advancing toward him, so appellant shot Waters three or four times, "until he stopped. Until the threat was gone." Appellant said he was not going to "wait 'til [Waters] gets right here with the knife," gesturing toward his chest.

After shooting Waters, appellant stated he was in shock. He called Waters-Smith to get her to return to the house, but was unable to reach her, so he texted her "911." Appellant then called 911 who told him to put the gun upstairs and go outside. After returning the gun to the closet, appellant changed clothes and put on deodorant before heading downstairs to meet police. When asked, appellant initially said he did not know why he did not call the police instead of shooting Waters. He later said he did not call the police because Waters had threatened to beat or kill him and Waters-Smith if they ever called the police on him. When asked why he did not leave the house during Waters' rampage, appellant replied, "Why would I leave my own house . . . and wait" until the "next time where he does cut my throat." He also stated that his life had been threatened and he was "not waiting for the blade to produce blood," or for Waters to throw things and destroy the

house. When asked where he aimed the shotgun, appellant replied that he was not "looking to shoot [Waters] in the leg," he was "looking to stop a deadly force." "Enough is enough," appellant reiterated numerous times throughout his interview.

James Bullock, a firearms examiner with the Virginia Department of Forensic Science, testified that the weapon appellant used to kill Waters was a twelve-gauge pump action shotgun, meaning appellant had to "physically move the slide back and forward to extract and eject the fired shot shell and load a shot shell . . . in the chamber for further shooting." Bullock further testified that the shotgun had a rifled barrel, meaning the shotgun pellets start to spread quicker, at around three feet.

Dr. Jeffrey J. Gofton, an assistant chief medical examiner, testified regarding four wounds to Waters' body. Wound 1[2] was a shotgun wound to the right leg, fired from an indeterminate range, which fractured Waters' femur and would have made him unable to effectively stand, walk, or run. Wound 2 was a shotgun wound to Waters' right flank and back, also fired from an indeterminate range. The pellets causing Wound 2 entered Waters' body on the right side and passed through the soft tissue of the right flank. Some pellets entered Waters' abdominal cavity, injuring his small and large bowels, as well as the right kidney. Wound 3 was a shotgun wound to Waters' back upper head and upper neck, fired from an intermediate range. When the shotgun pellets passed through Waters' neck, they hit his cervical spinal cord, perforating the spine and spinal cord, likely paralyzing him and causing quadriplegia. This shotgun wound would have affected Waters' ability to hold an item in his hands and to stand. Wound 4 was a shotgun wound to the head, fired from close range. Dr. Gofton detected soot embedded on the surface of Waters' tongue and stippling on

---

[2] The order in which the injuries were inflicted on Waters' body was undetermined and the labeling of those wounds by number in this opinion is not intended to indicate the order they were received.

- 4 -

his severely wounded face. Wadding was recovered within Wound 4. Wounds 3 and 4 were "immediately life threatening."

## II. ANALYSIS

A. <u>The evidence was sufficient to conclude that appellant did not act in self-defense.</u>

The jury was instructed to consider the charges of first-degree murder, second-degree murder, and voluntary manslaughter. Appellant argues that the trial court erred by not striking the first-degree murder and use of a firearm charges because he acted in self-defense when he shot Waters.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (emphasis in original)). "Rather, the relevant question is, upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Pijor*, 294 Va. at 512). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"Self-defense is an affirmative defense to a charge of murder, and in making such a plea, a 'defendant implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors.'"

*Jones v. Commonwealth*, 71 Va. App. 70, 86 (2019) (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)). "In order to establish self-defense, a defendant must show that he . . . 'reasonably believed that [he] was in danger of serious bodily harm or death.'" *Id.* (quoting *Sands*, 262 Va. at 730). "A defendant must also demonstrate 'that he was in imminent danger of harm' by showing 'an overt act or other circumstance that affords an immediate threat to safety.'" *Id.* (quoting *Carter v. Commonwealth*, 293 Va. 537, 544 (2017)).

Appellant offered several reasons for the shooting, including that he was trying to protect Waters-Smith, who was not home at the time of the shooting; he was not "waiting for the blade to produce blood"; he was not looking to shoot the victim in the leg but was "looking to stop a deadly force"; and "enough [was] enough." Appellant also stated that he shot the gun until the threat was gone. When asked why he shot Waters instead of leaving the house, appellant asked the detective, "Why would I leave my own house?" "Wait until the next time where he does cut my throat? Where he does throw stuff around that's gonna hurt . . . all that furniture?" Appellant likewise questioned what he would do if he called 911 and Waters denied his behavior. Indeed, he told detectives that it never occurred to him to call the police because Waters had told him before that "when [he] get[s] out [he's] gonna come back and . . . beat [our] asses" and "kill [them]. . . . Enough is enough." Many of appellant's responses as to why he shot Waters expressed his intent to stop Waters' future conduct rather than apprehension about an immediate deadly threat and his own immediate safety.

Moreover, the force used in self-defense "must not be excessive and must be reasonable in relation to the perceived threat." *Foster v. Commonwealth*, 13 Va. App. 380, 383 (1991). Appellant had superior weaponry than Waters; appellant carried a shotgun, which is capable of hitting its target at a distance, while Waters allegedly held a kitchen knife, which is only useful in close quarters, unless thrown. One of the shots that appellant fired paralyzed Waters, and one

shot fired from close range caused significant damage to Waters' face.  The medical examiner testified that these shotgun wounds were "immediately life threatening."  Another shot fractured Waters' femur and one shot was to Waters' back and rear flank and injured several of his organs.  It is unlikely that appellant, if he ever faced an imminent threat from Waters, faced an imminent threat after he shot Waters even once with the shotgun.  Yet appellant shot Waters four times.  There was clearly sufficient evidence for the jury to conclude that appellant used significantly more force than was necessary during the confrontation and did not act in self-defense.

B.  The evidence was sufficient to conclude that appellant did not act in the heat of passion.

Appellant next argues, in the alternative, that the trial court erred by not finding that he acted in the heat of passion, thus warranting a conviction of, at most, voluntary manslaughter, and an acquittal on the use of a firearm charge.

"Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'"  *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)).  "Malice may be inferred from the deliberate use of a deadly weapon."  *Luck v. Commonwealth*, 32 Va. App. 827, 834 (2000).  "To reduce a homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation.  Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice."  *Dandridge v. Commonwealth*, 72 Va. App. 669, 681 (2021) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 643 (1997)).  "[Heat of passion] excludes malice when provocation reasonably produces fear that causes one to act on impulse without conscious reflection."  *Id.* (quoting *Witherow v. Commonwealth*, 65 Va. App. 557, 567 (2015)).  "'[W]hether provocation, shown by credible evidence, is sufficient to engender the *furor brevis* necessary to rebut the presumption of malice

- 7 -

arising from a homicide is a question of fact' to be decided by the jury." *Id.* at 682 (quoting

*Woods v. Commonwealth*, 66 Va. App. 123, 131-32 (2016)).

The evidence in this case clearly supported a finding that appellant acted maliciously in shooting Waters four times with the shotgun. "Heat of passion requires the simultaneous 'reasonable provocation' by the victim and resulting passion by the defendant, such that the defendant acts 'on impulse without conscious reflection.'" *Williams v. Commonwealth*, 64 Va. App. 240, 252 (2015) (quoting *Graham v. Commonwealth*, 31 Va. App. 662, 671 (2000)). By appellant's own words, when allegedly confronted with the knife, he left the first floor where Waters remained and went to the closet located on another floor of the house to obtain the loaded, deadly weapon. He then deliberately returned downstairs where Waters was located, allegedly with a knife. After firing one shot at Waters, appellant manually pumped and consciously fired the shotgun three additional times. Waters was likely immobilized after any one of the gunshots, yet appellant shot him four times. The evidence was sufficient for a jury to conclude that appellant acted with malice when killing Waters.

C. The evidence was sufficient to support a finding of premeditation.

Appellant argues in the alternative that the trial court erred by not setting aside the verdict because there was no evidence of premeditation, meaning the most serious offense appellant could be convicted of was second-degree murder.

Premeditation, or the "adopt[ion] [of] a specific intent to kill . . . is what distinguishes first and second degree murder." *Smith v. Commonwealth*, 239 Va. 243, 259 (1990) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 485 (1989)). "[I]t is necessary that the killing should have been done on purpose, and not by accident, or without design." *Smith v. Commonwealth*, 220 Va. 696, 700 (1980) (quoting *Pannill v. Commonwealth*, 185 Va. 244, 255 (1946)). Although the accused need not have planned the killing for any specific period of time, "[t]he

intent to kill must come into existence at some time before the killing." *Id.* By its very nature, "premeditation . . . seldom can be proved by direct evidence" and must instead be established circumstantially. *Rhodes*, 238 Va. at 486. Circumstantial factors related to the killing itself, including the "brutality of the attack, and whether more than one blow was struck," can support a reasonable inference of premeditation. *Avent v. Commonwealth*, 279 Va. 175, 208 (2010). Whether a murder is willful, deliberate, and premeditated is an issue of fact to be resolved by the jury. *Beavers v. Commonwealth*, 245 Va. 268, 283 (1993).

Here, there was evidence from which the jury could have found that appellant acted intentionally and with premeditation when he shot Waters four times with a pump action, twelve-gauge shotgun. According to appellant, Waters became angry with Waters-Smith while she was getting E.W. ready for school. Waters cursed at Waters-Smith, pushed her, and threw furniture. After Waters-Smith left the house the second time, Waters continued the argument with appellant. When appellant went downstairs to retrieve a bottle of water, Waters allegedly waved a knife at him and threatened to put appellant "in the ground," cut him from ear to ear, and cut his throat. Appellant did not call the police but instead went to a closet located on another level of the house, retrieved his loaded, pump action, twelve-gauge shotgun, and went back downstairs where Waters was located. Appellant claimed that when he went downstairs with the shotgun, Waters advanced toward him with the knife and threatened to kill him. Appellant stated that he told Waters to calm down and put down the knife, but Waters continued toward him. Appellant then shot Waters four times.

In deciding whether an accused acted with premeditation, "the jury may properly consider the brutality of the attack." *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982). "Simply put, [appellant]'s deliberate acts of getting a loaded gun, bringing it [downstairs to where the victim was located], . . . shooting the victim, and continuing to [shoot] the victim . . .

all indicate a 'deliberate mind and formed design' rather than 'impulse without conscious reflection.'" *Williams*, 64 Va. App. at 253 (quoting *Graham*, 31 Va. App. at 672). "[P]remeditation and reasonable provocation cannot co-exist." *Turner v. Commonwealth*, 23 Va. App. 270, 277 (1996), *aff'd*, 255 Va. 1 (1997). From this evidence, the jury reasonably could have concluded that appellant intended to kill the victim and deliberately and premeditatedly did so, all while intentionally dismissing opportunities to avoid reengaging in the altercation altogether.

### III. CONCLUSION

The record in this case reveals a brutal shooting, where appellant shot Waters, his stepson, four times with a twelve-gauge shotgun, pumping the gun between each shot, including shooting him once in the head from close range. Appellant admitted that he separated himself from the immediate threat Waters posed while allegedly armed with a knife, went upstairs to retrieve a shotgun, and returned to Waters and shot him over and over again, including nearly blowing off his face from close range, even after having immobilized him. The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that appellant was guilty of first-degree murder and the use of a firearm in the commission of a felony.

*Affirmed.*