**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROY BRUCE SMITH,
<u>Petitioner-Appellant,</u>

v.

No. 96-7

RONALD ANGELONE, Director,
Virginia Department of Corrections,
<u>Respondent-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-93-710-3)

Argued: March 3, 1997

Decided: April 24, 1997

Before NIEMEYER, LUTTIG, and MOTZ,
Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Niemeyer and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Michele Jill Brace, VIRGINIA CAPITAL REPRESEN-
TATION RESOURCE CENTER, Richmond, Virginia, for Appellant.
John H. McLees, Jr., Assistant Attorney General, OFFICE OF THE
ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON
BRIEF:** Barbara L. Hartung, Mark E. Olive, VIRGINIA CAPITAL

REPRESENTATION RESOURCE CENTER, Richmond, Virginia,
for Appellant. James S. Gilmore, III, Attorney General of Virginia,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for
Appellee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Roy Bruce Smith was convicted of murdering Manassas Police
Sergeant John Conner and sentenced to death. After unsuccessfully
appealing his conviction and sentence, and pursuing a collateral
attack
in state court, he petitioned the district court for a writ of
habeas cor-
pus. We affirm the district court's denial of habeas relief.

I.

A Virginia jury convicted Smith of the willful, deliberate, and
pre-
meditated killing of Sgt. Conner on July 24, 1988. Concluding that
Smith's crime was vile and that Smith presented a future danger,
the
jury recommended a sentence of death. The trial court entered that
sentence on May 26, 1989. The Virginia Supreme Court affirmed the
conviction and sentence, Smith v. Commonwealth , 389 S.E.2d 871
(1990), and the United States Supreme Court denied Smith's petition
for a writ of certiorari. Smith v. Virginia, 498 U.S. 881 (1990).
Smith
filed a petition for habeas corpus with the state court, which
dismissed
it on August 19, 1991. After Smith unsuccessfully appealed to the
Virginia Supreme Court, the Supreme Court again denied certiorari.
Smith v. Virginia, 506 U.S. 848 (1992). On October 22, 1993, Smith
petitioned for a writ of habeas in federal court pursuant to 28
U.S.C.
§ 2254. The district court denied the writ on June 10, 1996 and
Smith
now appeals to this court.

The underlying facts are simple and tragic. On July 24, 1988, after
engaging in an ongoing dispute with his wife, Smith drank
prodigious
amounts of beer and then returned to his Manassas, Virginia home.
He strapped on two loaded pistols (a .357 magnum and a .44 mag-
num) and took a loaded assault rifle with him out to his front
stoop.

2

Smith shot into the air with his rifle. When neighbors complained, Smith said "[W]ait 'til I start shooting people." Smith's neighbors recalled that he also said "I hope somebody calls the police because I will shoot the first one that arrives and I hope they shoot me in return."

Smith reentered his house. Not surprisingly, his neighbors telephoned the police and warned them that Smith was armed and potentially dangerous. When Smith noticed that a motion sensitive light had been triggered in his backyard, he went outside again to investigate.

The Supreme Court of Virginia well described the events that followed:

> Just before 9:00 p.m., a number of police officers arrived on the scene and parked where their vehicles would not arouse Smith's suspicions. Officer Anderson, in one of the units, observed Smith "sitting on his front porch." Anderson directed the dispatcher to "[h]ave a unit cruise around . . . to the rear of the townhouses." The dispatcher relayed the order to Sgt. John Conner, a uniformed officer, who indicated that "he was en route." At this point, Smith "was still on [his] front steps," but when "some person . . . started across the street," Smith "immediately got up" and went inside. In a few moments, Sgt. Conner reported on his portable radio: "I've got him in sight he's coming out the back door." Other officers proceeded toward the rear of the house, and one of them, James K. Ryan, heard Sgt. Conner say: "Drop the rifle, drop the rifle now." Ryan then heard "gunfire going off," consisting of "eight to 12 . . . real sharp . . . cracks," followed by "a short pop and after that . . . there was a succession of real sharp cracks again."
>
> Ryan heard a man "groaning or . . . moaning" and, when he ran around the end of a fence separating Smith's back yard from his neighbor's, he saw Sgt. Conner lying on the ground in a "bare spot in the alleyway." Ryan observed "a lot of blood around [Conner's] head and two wounds in his back." Ryan left Conner in the care of another officer and went to

3

help subdue Smith, who was struggling with several officers some twenty to twenty-five feet from Conner's location.

Officer Steven Bamford "started up the alleyway" after he heard the shots fired. When he arrived at the rear of Smith's house, he saw Smith "crouching down [or sitting] next to the deck" with "a long barreled weapon laid across his lap." A light above the door to Smith's house "shown back out onto the alleyway and that yard, [and] illuminated that area."

As Bamford "took a step," Smith saw him and tried to "put a magazine in the bottom of the weapon." Bamford attempted to "get back out of the way," but slipped and fell. When he regained his feet, Smith started to get up, and Bamford pointed his shotgun at him and yelled, "[d]rop it" several times. Smith said, "I give up, I give up" and dropped his rifle, which was still equipped with a bayonet. Bamford told Smith to get down on his knees. Smith complied, but when Bamford ordered him to "put his hands on the ground and walk out, to lay flat," Smith refused. A struggle ensued involving several officers, who were unable to "get the rifle from under [Smith]." When one of the officers said, "he's got another gun," Bamford kicked Smith in the face, but he continued to struggle. The struggle ended only after Smith had been placed in leg restraints and handcuffed behind his back.

During the struggle, Smith told the officers to"[g]o ahead and kill [him]." After he was subdued, Smith said that Conner was the "first priority, take care of him, take care of him.
He's one of us, he's one of ours." Mortally wounded, Sgt. Conner died several hours later. In the gun battle with Smith, Conner suffered wounds to his right leg, right forearm, back, and head. The wound to the head, which caused "a peach size section of skull [to be] missing," proved fatal. Gunpowder debris was found in the head wound, indicating the wound was caused by a gunshot fired within three feet if inflicted by a handgun or six feet if inflicted by a rifle.

Smith v. Commonwealth, 389 S.E.2d 871, 874-76 (Va. 1990).

4

II.

Preliminarily, we must decide whether the newly enacted in forma pauperis filing fee provisions of the Prison Litigation Reform Act ("PLRA") apply to habeas proceedings. See Pub. L. No. 104-134, 110 Stat. 1321 (1996) (amending 28 U.S.C. § 1915). **1** To date, five circuits have considered whether the PLRA's fee provisions apply to habeas petitioners. Our sister circuits have unanimously held the PLRA filing fee provisions inapplicable in habeas proceedings. See Naddi v. Hill, 106 F.3d 275, 277 (9th Cir. 1997); United States v. Cole, 101 F.3d 1076, 1077 (5th Cir. 1996); Santana v. United States, 98 F.3d 752, 753-56 (3rd Cir. 1996); Martin v. United States , 96 F.3d 853, 855-56 (7th Cir. 1996); Reyes v. Keane, 90 F.3d 676, 678 (2d Cir. 1996).

The rationale of these cases is compelling. First, the PLRA contains no provision expressly including habeas petitioners within its reach. The in forma pauperis fee provisions of the PLRA apply when "a prisoner seek[s] to bring a civil action or appeal a judgment in a civil action." 28 U.S.C.A. § 1915(a)(2) (West, WESTLAW through Oct. 19, 1996). The PLRA does not define "civil action," and does not explicitly include or exclude habeas litigants from its reach. Although a habeas proceeding is considered a civil action for some purposes, Smith v. Bennett, 365 U.S. 708, 712 (1961), it is "more accurately regarded as being sui generis." Martin, 96 F.3d at 855. (Posner, C.J.).

As the Third Circuit recently explained:

    [H]abeas corpus cases are, in effect, hybrid actions whose

---

**1** We note that the State failed to address this issue at oral argument, and has not updated its short memorandum on this issue to respond to the five circuit courts (cited above) that have held that the PLRA fee provisions do not apply to habeas proceedings. Accordingly, it is unclear whether the State still opposes Smith's motion asserting that the PLRA in forma pauperis provisions do not apply to habeas proceedings. See Naddi v. Hill, 106 F.3d 275, 277 (9th Cir. 1997) (State of California acknowledges that "PLRA's revised forma pauperis provisions

relating
to prisoners do not apply to habeas proceedings."). However, since the
State has not withdrawn its opposition, we assume for purposes here that
it does still oppose the motion.

5

nature is not adequately captured by the phrase"civil action"; they are independent civil dispositions of completed criminal proceedings. James S. Liebman, 1 FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE § 2.1, at 3 (1988). The "civil" label is attached to habeas proceedings in order to distinguish them from "criminal" proceedings, which are intended to punish and require various constitutional guarantees. Boudin v. Thomas, 732 F.2d 1107, 1112 (2d Cir. 1984); see also Ex parte Tom Tong, 108 U.S. at 559, 2 S.Ct. at 872 (Habeas corpus review is a civil proceeding because "[p]roceedings to enforce civil rights are civil proceedings and proceedings for the punishment of crimes are criminal proceedings."). In light of their hybrid nature, habeas proceedings are often determined to be outside the reach of the phrase "civil action." See , e.g., Schlanger v. Seamans, 401 U.S. 487, 490 n. 4, 91 S.Ct. 995, 998 n. 4, 28 L.Ed.2d 251 (1971) (nationwide service of process under 28 U.S.C. § 1391(e) applicable in civil proceedings against United States employees and officers is not available in habeas corpus proceedings); Harris v. Nelson, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) (civil discovery rules do not automatically apply to habeas proceedings); Ewing v. Rodgers, 826 F.2d 967 (10th Cir. 1987) (a habeas corpus suit is not a "civil action" for purposes of an award of attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)); Boudin, 732 F.2d 1107 (similar); Dillard v. Blackburn, 780 F.2d 509 (5th Cir.1986) ("[H]abeas cases are not automatically subject to the rules governing civil actions."); see also Advisory Committee Note to Rule 11 of the Rules Governing § 2254 Cases (Federal Rules of Civil Procedure apply to habeas corpus proceedings only to the extent they are not inconsistent with the habeas rules).

Santana, 98 F.3d at 754-55.

Second, the text and context of the PLRA reflect a Congressional focus on prisoner civil rights litigation, as opposed to habeas proceedings. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), enacted just two days before passage of the PLRA, extensively reformed habeas

proceedings. This chronology strongly suggests that Congress intended to make its changes to habeas proceedings via the AEDPA, and to alter procedure in prisoner civil rights litigation in the PLRA. See Naddi, 106 F.3d at 277 ("A review of the language and intent of the PLRA reveals that Congress was focused on prisoner civil rights and conditions cases . . . especially in light of the major revisions to habeas corpus laws contained in the AEDPA . . . ."); Cole, 101 F.3d at 1077 ("Congress gave specific attention to perceived abuses in the filing of habeas corpus petitions by enacting Title I of the AEDPA. That title imposes several new restrictions on habeas corpus petitions, but makes no change in filing fees or in a prisoner's obligation for payment of existing fees."); Santana, 98 F.3d at 755 (Citing statements from the text and concluding that "[i]f Congress had wanted to reform the in forma pauperis status of habeas petitioners, it might have done so in the AEDPA."); Martin, 96 F.3d at 856 (same); Reyes, 90 F.3d at 678 (same).

Third, it seems unlikely that Congress meant the PLRA's complex payment structure to apply to the nominal filing fee for habeas petitions. In Title I of the AEDPA "Congress gave specific attention to perceived abuse in the filing of habeas petitions" but made "no change in filing fees." Reyes, 90 F.3d at 678. The habeas filing fee remained $5, compared to the $120 filing fee applicable to civil complaints. See 28 U.S.C. § 1914(a) (1994). Although "the PLRA establishes an elaborate installment payment plan by which litigants may fulfill their filing fee obligations," it "does not increase the $5 filing fee for a habeas petition . . . . Congress surely did not intend for the installment plan of the PLRA to apply to habeas corpus actions merely to assure deferred monthly payments of a $5.00 fee." Santana, 98 F.3d at 756.

Finally, applying the PLRA to habeas actions would have an inequitable result certainly unintended by Congress: a prisoner who had filed three groundless civil suits might be barred any access to habeas relief. The PLRA prevents prisoners from filing civil actions or appeals when three prior actions have been dismissed as frivolous, unless the prisoner proves that he is in imminent danger of serious bodily harm. See 28 U.S.C.A. § 1915(g) (West, WESTLAW through Oct. 19, 1996). Thus, as Judge Posner has pointed out, applying the

PLRA to habeas actions would "block [habeas] access to any prisoner who had filed three groundless civil suits and was unable to pay the

7

full appellate filing fee . . . . This result would be contrary to the long
tradition of ready access of prisoners to federal habeas corpus, as dis-
tinct from their access to tort remedies (a distinction emphasized in
<u>Heck v. Humphrey</u>, 512 U.S. 477 (1994))." <u>Martin</u>, 96 F.3d at 855-56.

For these and the other reasons discussed by our sister circuits, we
join them and hold that the in forma pauperis filing fee provisions of
the PLRA do not apply in habeas corpus actions.

III.

Turning to the merits of Smith's habeas petition, Smith claims inef-
fective assistance of counsel because his trial counsel did not seek the
appointment of various non-psychiatric experts for testimonial and
trial preparation purposes.[2]"Whether counsel's performance was con-
stitutionally adequate is a mixed question of law and fact which we
review <u>de novo</u>." <u>Savino v. Murray</u>, 82 F.3d 593, 598 (4th Cir.), <u>cert.</u>
<u>denied,</u> 117 S.Ct. 1 (1996).

At trial, the prosecution presented expert testimony to establish that
Smith had shot Sgt. Conner in the head with a .357 magnum pistol
at close range. Dr. Frances Field testified that there was powder resi-
due in Sgt. Conner's head wound consistent with"a close gunshot
wound," meaning within three feet for a pistol, and within six feet for
a rifle. Dr. Field stated that blood found on the barrel of Smith's .357
magnum was consistent with "blow back" from a gun shot four to six
inches away from Sgt. Conner. Julien Mason, a firearms identification
expert, explained that there were bullet abrasions on Smith's fence
that were consistent with the bullets of a .357 magnum. Donald
McClanrock, a forensic scientist, testified that Smith had more barium
gas on his left hand than on his right hand, and that this finding was
consistent with Smith having shot a revolver with his left hand.

---

[2] The State argues on appeal that the new evidentiary standard for
habeas corpus actions included in Title I of the AEDPA should be
applied in this case. Smith responds that application of the AEDPA to his
case would have an impermissible retroactive effect. We need not

decide
whether the AEDPA's new evidentiary standard applies because, even under the more expansive prior scope of review, Smith is not entitled to relief. See Cooper v. Taylor, 103 F.3d 366, 369 n. 1 (4th Cir. 1996) (en banc).

Smith's trial counsel attacked the prosecution's theory through cross-examination. Dr. Field admitted on cross-examination that the blood on the muzzle of the .357 was not necessarily the result of a "blow back," and that the bullet that caused Sgt. Conner's back wound might have ricocheted. Firearms expert Julien Mason recognized that the bullet that caused the back wound likely ricocheted off of Sgt. Conner's belt, and that the same bullet may have caused the head wound. Mason acknowledged that he found no gunpowder residue in his examination of tissue from Sgt. Conner's head wound. Mason also admitted that he could not determine when the spent .357 casings had been fired. On cross-examination McClanrock conceded that the gases on Smith's hand could have come from the rifle. There was also trial testimony that the amount of time between Smith's apprehension and the sound of shots was too short for Smith to traverse the distance of his driveway, shoot Sgt. Conner, and return to the side door of his house.

On federal habeas, Smith presented new expert testimony aimed at establishing that he did not shoot Sgt. Conner in the head with the .357 magnum pistol. Gary Laughlin, a forensic microscopist and metallurgist, testified that the metal fragments in Sgt. Conner's head wound could not have come from a .357, but could have come from Smith's rifle, and that there was no powder residue in the head wound. Stewart James, a blood stain expert, opined that the blood on the .357 magnum could not have been "blow back" and that if it was blow back, there should have been blood on Smith's clothes. Forensic pathologist Dr. Vincent DiMaio stated that Sgt. Conner's head wound was caused by the rifle, and from at least two or more feet away. Lucien Haag, a firearms expert, concluded that there was evidence that Smith had not fired the .357 the night of July 24, 1988. **3**

---

**3** At the habeas hearing, Smith also presented expert testimony intended to prove that he did not fire first at Sgt. Conner. At trial Leslie Freed, Smith's emergency room nurse, testified that the trajectory of the entrance and exit of Smith's foot wound was consistent with Smith facing towards Sgt. Conner (and therefore possibly firing first). Lucien Haag testified before the habeas court that the bullet came from the other side, which was more consistent with Smith facing a different direction (and possibly not firing first). This evidence is of little consequence,

however, because the direction Smith was facing was not pivotal to the prosecution's case. It was raised on <u>cross</u> examination by Smith's lawyers, and was not an issue raised or focused on by the State. Furthermore, in light of the other evidence presented at trial that Smith shot first, it is unlikely this evidence would have made a difference.

9

We have recognized that an indigent defendant has a right to assis-
tance of an expert if "a substantial question exists over an issue
requiring expert testimony for its resolution and the defendant's
posi-
tion cannot be fully developed without professional assistance."
Williams v. Martin, 618 F.2d 1021, 1026 (4th Cir. 1980) (citing
Jacobs v. United States, 350 F.2d 571, 573 (4th Cir. 1965)). But
see
Caldwell v. Mississippi, 472 U.S. 320, 323-24 n.1 (1985)
(specifically
declining to rule on this issue).

Our inquiry into whether trial counsel's failure to request expert
assistance was constitutionally deficient is controlled by
Strickland v.
Washington, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was
> so defective as to require reversal of a conviction or death
> sentence has two components. First, the defendant must
> show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant
> must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable. Unless a defendant makes both
> showings, it cannot be said that the conviction or death sen-
> tence resulted from a breakdown in the adversary process
> that renders the result unreliable.

Strickland, 466 U.S. at 687. The district court held that Smith had
failed under "Strickland's performance prong," because Smith's
trial
counsel reasonably chose to rely upon cross-examination of the
State's own witnesses to establish his case.

We agree. The parties spend a significant amount of time arguing
about whether Smith would have met the standard for court appoint-
ment of expert assistance if he had sought appointment of such
experts at trial. Regardless of whether the trial court would have
appointed such experts, it was reasonable for Smith's trial
attorneys
to rely, as they said, on "the Commonwealth's own, quote, experts
verifying Mr. Smith's version of what happened." Even in hindsight,

10

and with the help of a battery of experts, Smith was not able to prove
much more at the habeas hearing than his lawyers did at trial. Smith's
trial counsel was able to use effectively the testimony of the State's
own experts, especially Julien Mason, to build his theory of the case.
Smith's trial lawyers made a tactical decision to rely on Mason and
other prosecution experts to dispute the prosecution's theory, and we
cannot say in hindsight that this was an unreasonable tactic.

In short, Smith has not demonstrated that his trial counsel's perfor-
mance was constitutionally deficient.

IV.

Smith next argues that the district court erred in finding a number
of his claims procedurally barred. Smith maintains that there was
"cause" for the procedural default: his state habeas attorney's refusal
to present his federal claims, despite Smith's orders. It does appear
that Smith's state habeas counsel ignored Smith's requests to file fed-
eral constitutional claims along with his state constitutional claims.

The Supreme Court has held that "[t]here is no constitutional right
to an attorney in state post-conviction proceedings. Consequently, a
petitioner cannot claim constitutionally ineffective assistance of coun-
sel in such proceedings." Coleman v. Thompson, 501 U.S. 722, 752
(1991) (citations omitted). An attorney's errors on state habeas can
"only constitute `cause' if [the defendant] was denied his right to
effective assistance of counsel. As explained [in Coleman, the defen-
dant] had no such right in his state habeas appeal." Wise v. Williams,
982 F.2d 142, 145 (4th Cir. 1992). Therefore, under Wise and
Coleman, Smith had no right to counsel (effective or otherwise) on
state habeas, and cannot claim ineffective assistance of state habeas
counsel, or claim that counsel's errors were cause for procedural
default.**4**

---

**4** Smith also attempts to recast his ineffective assistance claim as a due
process claim. See Hicks v. Oklahoma, 447 U.S. 343, 346, (1980).

<u>See</u>
<u>also Buchanan v. Angelone</u>, 103 F.3d 344, 348 (4th Cir. 1996) ("It is
true, at least in the context of discretionary sentencing by a jury, that
denial of a state procedural right may rise to the level of a federal due

11

V.

Finally, Smith challenges the district court's denial of his July, 1995 motion to amend his habeas petition. Smith's proposed amendment raised new claims of prosecutorial misconduct based upon taped interviews of Officer Goodman and Officer Ryan, who were at the scene of the crime. Smith asserts that the tapes were exculpatory and that the prosecution failed to disclose the tapes at trial.**5** The district court denied Smith leave to amend because it found Smith's delay in uncovering the evidence unreasonable, and that the delay to the State was "inordinately prejudicial."

_____

process violation.") We have never held that a prisoner may claim a due process violation based upon his lawyer's performance on state habeas and we decline to do so today because the failure of Smith's state habeas counsel to pursue Smith's federal constitutional claims did not violate any due process right. Smith has not been denied review of those claims; rather, those claims have been fully reviewed on direct appeal. Indeed, even if those claims had been pursued on state habeas, they would almost certainly have been barred because they had already been raised and rejected on direct appeal, and Virginia bars repetitive review of identical issues on habeas. See <u>Slayton v. Parrigan</u>, 205 S.E.2d 680 (Va. 1974); <u>Hawks v. Cox</u>, 175 S.E.2d 271 (Va. 1970).

**5** Failure to disclose the tapes hardly constituted prosecutorial misconduct. Smith asserts that the taped interviews of Officers Goodman and Ryan prove: (1) Smith could not have recognized Sgt. Conner as a police officer because the visibility was poor the night of the shooting and (2) Smith did not walk down the alley and shoot Sgt. Conner at close range. On the tapes the officers do state that visibility was poor, but Smith had already presented similar evidence at trial and the State had countered it with a good deal of testimony that visibility was entirely adequate. In any event and most significantly, the tapes make it clear that neither Officer Goodman nor Officer Ryan was positioned to report

what Smith could see or whether Smith had shot Sgt. Conner at close range. Thus, the tapes offer no rebuttal to the mountain of physical evidence presented to the jury, Smith's statement that he would shoot the first police officer who arrived, and the fact that Sgt. Conner, the first officer on the scene, twice asked Smith to "drop the rifle" immediately prior to being shot by Smith. For these reasons, the tapes were minimally helpful to Smith and would almost surely fail the "materiality" test of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

We review a denial of a motion to amend for abuse of discretion. See Chisolm v. Transouth Fin. Corp., 95 F.3d 331, 338 (4th Cir. 1996). A party may amend his pleading only by leave of the court, but "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); Foman v. Davis, 371 U.S. 178, 182 (1962). Although "[d]elay alone" should not suffice as reason for denial of a motion to amend, Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir. 1980), "this court has reasoned that a motion to amend may be denied when it has been unduly delayed and when allowing the motion would prejudice the nonmovant." Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 941 (4th Cir. 1995).

We cannot conclude that the district court erred in finding that Smith's motion to amend was unduly delayed and prejudicial. Smith had months to discover the tapes at issue. In the fall of 1994 the State provided Smith with a list of items available for inspection, including an "interview tape," with interviews of officers "Bamford, Goodman, Bagshaw." On October 17, 1994, Smith's counsel met with the State's attorneys at the Manassas police department to inspect their evidence. At this meeting, Smith's attorneys refused the State's offer of listening equipment to review the interview tapes. Later the tapes were stored with the court, allowing Smith free access. In short, Smith's attorneys had notice of the existence of, and access to, the tapes from at least October 1994, and yet they did not review the tapes until June 1995 and did not move to amend the habeas petition until early July 1995.

Moreover, before the July motion to amend, Smith's case had already been delayed on multiple occasions. Following these delays, the court made clear that the case had dragged on for two years, and the court expected things to move apace: "The court is anxious to dispose of this case in as speedy a manner as justice will allow. Accordingly, counsel are ADVISED that the court will look upon further delays with extreme displeasure."

"Amendments near the time of trial may be particularly disruptive, and may therefore be subject to special scrutiny." Deasy v. Hill, 833 F.2d 38, 41 (4th Cir. 1987). In this case Smith moved to amend liter-

ally on the eve of trial: a two-day evidentiary hearing on Smith's inef-
fective assistance of counsel claims was set for July 12, 1995 and

13

Smith filed his motion to amend the habeas petition on July 5, 1995.
As in _Deasy_, in this case "the delay was significant, and the motion
to amend came right before trial and after discovery was complete." _Id._

The timing of the amendment also illuminates the prejudice suf-
fered by the State. On the one hand, "it would have been manifestly
unfair to make [the State] go to trial" with a week's notice and "with-
out having had a fair opportunity to prepare [its] case." _Nat'l Bank of
Washington v. Pearson_, 863 F.2d 322, 328 (4th Cir. 1988). On the
other hand, it would have been unfair to make the State "conduct dis-
covery a second time in order to meet [the] newly asserted [claim]."
_Id._ We have held that "[b]elated claims which change the character
of litigation are not favored." _Deasy_, 833 F.2d at 42; _see also Lone
Star_, 43 F.3d at 940 (finding prejudice because a motion to amend
filed "on the last day of discovery would have raised new issues,
which were not involved in the case during the discovery and were
not the subject of Plaintiff's discovery and trial preparation."); 4
Charles A. Wright et al., _Federal Practice and Procedure_ § 1487, at
623-26 (2d ed. 1990) (If an amendment "is proposed late enough" and
requires the opponent "to engage in significant new preparation" or
results in the "added expense and the burden of a more complicated
and lengthy trial," prejudice may be found.).

Granting Smith's motion to amend would have required the State
to argue a whole new set of claims, based on completely new theories.
The district court certainly would have had to schedule another hear-
ing, and perhaps order more discovery. As the district court noted, the
amendment would have required the State's "lawyers [to] spend addi-
tional time, money, and energy laboring in this Court's trenches." In
sum, Smith's motion to amend would have required the State to begin
anew on a new set of claims a week before trial and would have
delayed the resolution of Smith's case indefinitely. This showing suf-
fices to demonstrate prejudice. _See Lone Star_, 43 F.3d at 940;
_Pearson_, 863 F.2d at 328; _Deasy_, 833 F.2d at 41-42.

Given the multiple past delays, the late hour of Smith's motion to
amend, and the great additional burdens granting the motion would
have placed on the State, the district court did not abuse its discretion

in denying the motion.

14

VI.

For the foregoing reasons the judgment of the district court is hereby

<u>AFFIRMED</u>.

15