UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



No. 96-1856

CRAIG MARTIN,

Petitioner, Appellant,

v.

LYNN BISSONETTE, ET AL.,

Respondents, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]



Before

Selya, Circuit Judge,

Aldrich and Cyr, Senior Circuit Judges.



Carol A. Donovan, Committee for Public Counsel Services, for
appellant.
James S. Liebman, Elaine R. Jones, George H. Kendall, and L.
Song Richardson on combined brief for James S. Liebman and NAACP
Legal Defense & Educational Fund, Inc., amici curiae.
Ellyn H. Lazar, Assistant Attorney General, Commonwealth of
Massachusetts, with whom Scott Harshbarger, Attorney General, was
on brief, for appellees.


July 11, 1997


REVISED OPINION



SELYA,  Circuit  Judge .   Petitioner-appellant Craig Martin,

a state prisoner, sought habeas relief based on a claim that the

state court's exclusion of his mother from the courtroom during

part  of  the  testimony of a key prosecution witness deprived him of

his Sixth Amendment right to a public trial. The United States

District Court for the District of Massachusetts denied the writ.

Martin appeals.

As a preliminary matter, we must explore, for the first

time in this circuit, the interrelationship between habeas

petitions and the newly enacted Prison Litigation Reform Act of

1996 (PLRA). Once that expedition is finished, we address the

merits of Martin's claim. In the end, we affirm the judgment of

the district court.

I. PROCEDURAL HISTORY

On  May  7,  1991,  a  Barnstable County (Massachusetts) grand

jury indicted Martin on charges of breaking and entering. See

Mass. Gen. Laws ch. 266, S 18 (1990). Later that year, a petit

jury  found  the petitioner guilty as charged, and the court imposed

a substantial prison sentence. Martin's subsequent attempts to

gain surcease in the state court system proved unavailing. See

Commonwealth v. Martin, 653 N.E.2d 603 (Mass. App. Ct.), further

rev. denied, 654 N.E.2d 1202 (Mass. 1995).

On March 12, 1996, the petitioner applied for a writ of

habeas corpus in the federal district court, see 28 U.S.C. S 2254

(1994), naming as respondents various state officials (who, for

ease in reference, we call "the Commonwealth"). He premised the

2

application on a claim that the trial court's exclusion of his

mother from the courtroom during part of the testimony of a key

prosecution  witness deprived him of his Sixth Amendment right to a

public trial. The district court, without much in the way of

independent  elaboration, turned a deaf ear and thereafter denied a

certificate of probable cause. We nonetheless granted a

certificate of appealability. See 28 U.S.C.A. S 2253(c)(1) (West

Supp. 1997).

II. THE COURSE OF TRIAL

To understand the petitioner's claim, we must rehearse

his trial in the Barnstable Superior Court. We offer only a

synopsis, confident that the reader who thirsts for additional

detail can find it elsewhere. See Martin, 653 N.E.2d at 604-06.

The  Commonwealth alleged that Martin and Niles Hinckley,

his half-brother, broke into the office of the Yarmouth town dump

and  stole  a  safe. After removing the safe from the building, they

told  a  friend, Thomas Violette, that they needed help to transport

"something  big."   Violette obliged. As the three men left the dump

in Hinckley's car, with the safe aboard, they came across Linda

Rose,  whose  automobile  had failed her. She joined them. The group

proceeded to Rose's home. Once there, the men dragged the safe

into the house and tried to open it. Unsettled by this endeavor,

Rose  departed with her children. Violette also grew anxious about

his involvement; he left the premises a few minutes after Martin

and Hinckley began working on the safe, pondered his predicament,

and then made a beeline for the police. The culprits were

3

apprehended and charged in short order.

Martin and Hinckley were tried together. The

Commonwealth called Rose as a witness in its case in chief. She

stated repeatedly that she did not see (or, at least, could not

recall) much of what had transpired on the evening in question.

The  prosecutor told the judge at sidebar that Rose was nervous and

scared and suggested that her professed lapses of memory were

disingenuous. The trial adjourned in the midst of Rose's cross-

examination.

On the next trial day, the prosecutor voiced concern

about  possible witness intimidation and the judge conducted a voir

dire outside the presence of the jury. During that proceeding,

Rose  admitted  that  portions of her previous testimony had been less

than truthful. She also stated that she had been frightened by

James  Martin  (the petitioner's brother, who, she said, had pointed

at her from the back of the courtroom), by the petitioner's

girlfriend,  and by an unidentified woman (who, she said, had given

her  dirty  looks,  "scaring [her] from testifying"). Rose went on to

recount  that  the  petitioner's girlfriend had signalled her to "come

over and talk" outside the courtroom; that the petitioner himself

had accosted her shortly after his arrest and instructed her to

testify (falsely) that Hinckley had acted alone in expropriating

the safe; and that, on another occasion, the Martin brothers

ordered her to deny the petitioner's role in the burglary.

Based  on  Rose's statements, the court determined that it

was  "in  the  interest of justice that the Commonwealth be permitted

4

to reopen and redirect on Miss Rose." In so ruling, the judge

witnesses (including Rose) and that the petitioner had been found

uilty  of  intimidating Rose. The judge then ordered the courtroom

c noted  that  James Martin already had pleaded guilty to intimidating glosed  during  the  remainder of Rose's testimony and refused to make

an exception for the petitioner's mother.1 During her reopened

testimony, Rose described the petitioner's attempts to intimidate

her,  but  her  recollection of the evening in question did not differ

materially from her original testimony.

III. THE PRISON LITIGATION REFORM ACT

We begin with the PLRA, Pub. L. No. 104-134, tit. VIII,

110  Stat.  1321, 1366 (1996), which, among other things, amended 28

U.S.C. S 1915 to require convicts to pay the full amount of the

filing  fees  in civil actions. See PLRA, S 804, 110 Stat. at 1373-

1375. The petitioner did not pay a filing fee to the district

court and has not paid any other fees associated with the

maintenance  of his suit.2 Thus, the threshold question is whether

the PLRA applies to habeas petitions brought in federal court by

state prisoners.

Though  habeas proceedings are technically civil actions,

see  Ex  parte  Tom Tong, 108 U.S. 556, 559 (1883), the Supreme Court

has long recognized that the label is ill-fitting and that habeas

1Although the closure order exempted the press, there is no
evidence  in  the  record  that any reporters were in attendance during
Rose's reopened testimony. See Martin, 653 N.E.2d at 605.

2The petitioner did file a motion to proceed in forma
pauperis, and although the district court did not grant that
motion, he appears eligible for such a dispensation.

5

is  in  fact  a  unique  creature of the law. See Harris v. Nelson, 394

U.S. 286, 293-94 (1969). Here, despite the undiscriminating

reference  to  "civil  actions," no fewer than four pieces of evidence

indicate  that Congress did not intend the PLRA to intrude into the

habeas  realm.   First,  Congress, in enacting the PLRA, took dead aim

at suits challenging conditions of confinement, and nothing in

either the PLRA's text or its legislative history suggests that

habeas cases were perceived to comprise a part of this problem.

Second, Congress specifically addressed what it perceived to be

habeas  abuses in the Antiterrorism and Effective Death Penalty Act

of 1996 (AEDPA), Pub. L. No. 104-132, tit. I, 110 Stat. 1216

(1996),  which it enacted contemporaneous with passage of the PLRA,

and the abuses it enumerated did not include the non-payment of

filing  fees.  See Reyes v. Keane, 90 F.3d 676, 678 (2d Cir. 1996).

Third,  extending the PLRA to habeas cases would deny habeas review

to any prisoner proceeding in forma pauperis who had previously

filed three groundless (though unrelated) civil suits while

incarcerated, see 28 U.S.C.A. S 1915(g) (West Supp. 1997), thereby

frustrating a storied tradition of reasonable access to habeas

review.   See  Martin  v.  Un ited States, 96 F.3d 853, 855-56 (7th Cir.

1996). We seriously doubt that Congress would have purposed to

narrow the habeas gateway in so restrictive a manner without some

explicit reference to that effect. Last, but not least, this

drastic  curtailment  is  largely unnecessary because the AEDPA itself

effectively curbs frivolous habeas litigation through limits on

successive petitions. See 28 U.S.C.A. S 2244 (West Supp. 1997).

6

We are not alone in finding these indicia persuasive.

the circuits that have addressed this question to date hav

not apply to habeas petitions. Smith

v All e agreed  that  the  PLRA  does See .  Angelone ,  111 F.3d 1126, 1131 (4th Cir. 1997); United States v.

Levi ,  111  F.3d 955, 956 (D.C. Cir. 1997) (per curiam); Anderson v.

Singletary, 111 F.3d 801, 805 (11th Cir. 1997); United States v.

Simmonds, 111 F.3d 737, 743 (10th Cir. 1997); Naddi v. Hill, 106

F.3d 275, 277 (9th Cir. 1997); United States v. Cole, 101 F.3d

1076,  1077  (5th Cir. 1996); Santana v. United States, 98 F.3d 752,

756  (3d  Cir.  1996); Martin, 96 F.3d at 855; Reyes, 90 F.3d at 678.

We concur with these courts and endorse their reasoning.

Accordingly, we hold that the PLRA does not apply to habeas

petitions prosecuted in federal courts by state prisoners.

IV. STANDARD OF REVIEW

On April 24, 1996 over a month after Martin filed his

petition the President signed the AEDPA into law, thereby

altering  the  legal framework which governs federal judicial review

of habeas corpus applications. See Pub. L. No. 104-132, tit. I,

110  Stat.  1216 (1996). The Supreme Court has now decided that the

AEDPA  does  not apply to habeas petitions which were pending at the

time the new law took effect. See Lindh v. Murphy, No. 96-6298,

1997 WL 338568, at *8 (U.S. June 23, 1997).3 The petitioner is

    3 Prior  to  the  Court's resolution of the question by a five-to-
four margin in Lindh, the circuits had divided on the issue of
retroactivity. Compare Hunter v. United States, 101 F.3d 1565,
1573 (11th Cir. 1996), cert. denied, 117 S. Ct. 1695 (1997) and
Drinkard v. Johnson, 97 F.3d 751, 766 (5th Cir. 1996), cert.
denied, 117 S. Ct. 1114 (1997) and Lindh v. Murphy, 96 F.3d 856,
867 (7th Cir. 1996) (all holding that the judicial review

7

therefore entitled to plenary review of his claim that the stat

See Dubois

, 9 (1st Cir. 1994) (explaining that federal court e court  abridged  his  constitutional rights. Scarpa v. , 38 F.3d 1 s

traditionally afford de novo review in respect to habeas petitions

brought by state prisoners), cert. denied, 115 S. Ct. 940 (1995);

Siegfriedt v. Fair, 982 F.2d 14, 16 (1st Cir. 1992) (similar);

Chakouian v. Moran, 975 F.2d 931, 934 (1st Cir. 1992) (similar).

V. THE MERITS

Refined  to  bare essence, the petitioner's constitutional

claim is that his Sixth Amendment right to a public trial was

offended by the exclusion of his mother from the courtroom during

Rose's reopened testimony.

A.

This claim rests primarily on the petitioner's

interpretation of Waller v. Georgia, 467 U.S. 39 (1984). In

Waller,  the  Supreme Court set forth a quadripartite test that must

be passed to justify closing a courtroom in a criminal case:

[T]he party seeking to close the hearing must
advance an overriding interest that is likely
to be prejudiced, the closure must be no
broader than necessary to protect that
interest, the trial court must consider
reasonable alternatives to closing the

provisions  of the AEDPA applied to habeas petitions pending on its
effective date) with Jeffries v. Wood, No. 95-99003, 1997 WL
253326, at *11 (9th Cir. May 12, 1997) (en banc) and Burkett v.
Love, 89 F.3d 135, 138 (3d Cir. 1996) and Edens v. Hannigan, 87
F.3d  1109,  1112  n.1  (10th Cir. 1996) (all holding to the contrary).
We had chosen the former path in an earlier iteration of this
opinion. Because Martin's case was still pending before us on a
petition for rehearing when Lindh was decided, we withdrew our
earlier opinion and now reevaluate Martin's claims under the pre-
AEDPA standard.

8

proceeding,  and it must make findings adequate
to support the closure.

Id.  at  48.   The  petitioner does not challenge the judge's authority

to exclude from the courtroom those whose presence actually

intimidates  a witness. Rather, emphasizing Waller's second prong,

he posits that the exclusion of his mother was broader than

necessary to protect the overriding interest of ensuring the

integrity of the ongoing trial.

We  do  not  agree. Nothing in Waller or in any other case

cited  by  the  petitioner  suggests that a trial judge, presented with

evidence of repeated attempts at witness intimidation and a live

witness who harbors a plausible fear of testifying before

spectators known and unknown to her, must undertake an assessment

of the exact level of affrightment created by each specific

spectator, one by one, before closing a courtroom to the public.4

Rose  already  had  been  frightened and intimidated by the petitioner,

the petitioner's brother, the petitioner's girlfriend, and an

unidentified woman. The trial court's closure order was neither

broader nor longer than was reasonably necessary to end this

    4 On  direct review, the Massachusetts Appeals Court summarized
the matter as follows:

While  we  think the judge should have expressly
rather than implicitly determined whether the
witness would have had difficulty testifying
with the defendant's mother present, it was
not  constitutional error requiring a new trial
not to do so in the particular circumstances
of  recent  intimidation by other family members
and persons sympathetic to the defendant.

Martin, 653 N.E.2d at 606. We believe that this is a correct
synthesis of applicable constitutional principles.

9

widespread reign of harassment and secure the witness's accurate

testimony.

Our judgment that the trial court's closure order does

not run afoul of Waller is buttressed by the Second Circuit's

decision  in  W oods v. Kuhlmann, 977 F.2d 74, 78 (2d Cir. 1992). In

Woods, a prosecutor informed the judge that one or two members of

the defendant's family had visited a witness at her house and

warned her not to testify, and the judge then excluded all family

members from the courtroom during the witness's testimony. The

Woods  defendant  argued,  as does the petitioner here, that the trial

court's order swept too broadly. The court of appeals rejected

this argument, concurring with the trial judge that "the closure

order  was  no  broader than was necessary to enable [the witness] to

testify" and that a narrower closure would have been ineffective.

Id.  at  77.   In  short,  Woo ds strongly supports the result reached by

the district court in this case.

B.

The petitioner has one last string to his bow. He

insists that we should consider the exclusion of his mother from

the  courtroom under a "heightened" standard which presumably would

be applicable whenever a court excluded a family member from a

criminal  defendant's  trial. The short, entirely dispositive answer

to this plaint is that the Supreme Court opinion on which the

petitioner relies, In re Oliver, 333 U.S. 257 (1948), does not

10

contain any such requirement.5 Nothing in Oliver or, for that

matter,  in  Vidal  v.  Willi ams, 31 F.3d 67, 69 (2d Cir. 1994) (noting

"a  special  concern  for  assuring the attendance of family members of

the accused"), suggests that a trial court need go beyond the

already stringent requirements of Waller before removing a

defendant's  family members from the courtroom. Those requirements

 including  the existence of an overriding interest that is likely

to be prejudiced in the absence of closure and that the closure

must be no more expansive than necessary to protect that interest

adequately safeguard a defendant's interest in permitting his

family to be present in the courtroom.

In  sum,  we  not only reject the petitioner's assertion of

a  heightened  standard for the exclusion of family members from the

courtroom, but we also note the exquisite irony of Martin raising

the argument where, as here, his relatives played prominent roles

in menacing a witness. On these peculiar facts, it seems

especially reasonable for the trial court to have concluded that

the  witness's founded fears would only be quelled if the courtroom

were cleared of spectators associated with those persons who

already had threatened her.

VII. CONCLUSION

We  need  go  no further. Since the PLRA does not apply in

the habeas context, Martin's application was properly before the

5Oliver dealt with an entirely secret trial in which the
defendant was denied both counsel and proper notice. See Oliver,
333  U.S.  at  258-59. It is altogether dissimilar to this case, and
cannot  begin  to  bear  the  load that the petitioner so casually piles
upon it.

11

district court notwithstanding his failure to pay a filing fee.

Accordingly,  we reach the merits. Once there, however, we discern

no constitutional error in the state trial court's decision to

close the courtroom during the testimony of Linda Rose.

Affirmed.

12